**Charles R. RICHARDS, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 8, 1974.

Rehearing Denied Jan. 24, 1975.

Anthony M. Wilhoit, Public Defender, J. Vincent Aprile, II, Asst. Public Defender, Frankfort, for appellant.

Ed W. Hancock, Atty. Gen., Robert W. Riley, Asst. Atty. Gen., Frankfort, for appellee.

CATINNA, Commissioner.

Charles Rudy Richards appeals from a judgment sentencing him to life imprisonment pursuant to the verdict of a jury finding him guilty of murder.

On February 1, 1973, at about 8:40 p. m., the sheriff of Graves County received a telephone call from a Charles Richards, later identified as Charles Rudy Richards.

This caller informed the sheriff that he had shot Desmond Carter. The sheriff testified: "I went to Desmond Carter's home and went in and Desmond was dead and he was sitting in a kitchen table chair turned the best I remember a little bit sideways and he was sitting in the chair with his head forward and a puddle of blood in front of him and behind him as if maybe his head at one time had been back and he had slumped forward. * * * The man was shot from behind, I would say at just about the base of the skull and evidently the man was standing with the man sitting in the chair and the man standing behind him would probably have been at a downward angle."

The sheriff arrested Richards at his home, and again Richards stated to the sheriff that he had shot Carter. On the afternoon of February 1, 1973, Richards had told Michael Ellegood that he was going to shoot Carter. He had repeated this same threat to Gobel Burgess and Mary Richards, an aunt by marriage. On the night of February 1, 1973, Richards admitted to his mother and father that he had shot Carter, although the admissions to his father were followed by denials.

The coroner testified: "Well, as I stepped inside this back door there was a man sitting in a kitchen chair just sort of slumped over like where he just barely had his head bent over." The man in the chair, Carter, had died "from a gunshot wound in the base of his skull." The coroner also testified that he "examined his face and body more to see if maybe if there had been struggles or signs of struggle anywhere else," but there was nothing to indicate that there had been a struggle.

These are the essential facts of the case. Further details will be mentioned as we consider the questions raised on this appeal, which are as follows:

"1. The trial court erred to appellant's substantial prejudice by overruling appellant's motion for a directed verdict."

■ Richards claims that he was insane when he shot Carter and contends that the court should have directed a verdict of not guilty, as the evidence established his insanity as a matter of law. Dr. Marion Charles Glasgow, a psychiatrist, testified that his evaluation of Richards, on October 11, 1973, established that he was a schizophrenic, latent type. It was his opinion that Richards did not know he was violating the law when he shot Carter, or, if he did, he could not resist the impulse. The doctor stated that when he examined Richards on October 11, 1973, he was markedly different from the ordinary individual. Regarding changes in Richards' mental condition after February 1, 1973, the doctor said, "I have no more reason to assume that he did change than to assume that he didn't and this is what antedates it back until February."

Lay testimony regarding Richards' mental condition was confined primarily to personality changes that the witnesses had observed subsequent to Richards' service in Vietnam. They also claimed that he had developed a "drinking problem" that had not previously existed.

The medical testimony was not sufficient to establish as a matter of law that Richards was insane on February 1, 1973. The question was, therefore, one of fact to be determined by a jury. The motion for a directed verdict was properly overruled. Newsome v. Commonwealth, Ky., 366 S. W.2d 174 (1963); Moore v. Commonwealth, Ky., 446 S.W.2d 271 (1969).

"2. The court below erred to appellant's substantial prejudice by failing to postpone the trial and order an evidentiary hearing to determine appellant's mental capacity to stand trial since the court below had reasonable grounds to believe appellant was insane."

■ Counsel for Richards would place upon the trial court the burden of taking judicial notice of Richards' mental incapacity. Although the trial had been previously continued for the specific purpose of Richards' submitting to a psychiatric evaluation, counsel failed to bring the results of this examination to the attention of the trial court. With full knowledge of the contents of this report, counsel did not move for a hearing or a continuance. Richards did not testify, nor did Dr. Glasgow testify that Richards did not have sufficient mental capacity to stand trial. This question of capacity was not brought to the trial court's attention, nor were manifestations of such incapacity so obvious that the trial court could not fail to be aware of them. The failure to conduct a hearing was not error. Matthews v. Commonwealth, Ky., 468 S.W.2d 313 (1971); Hicks v. Commonwealth, Ky., 488 S.W.2d 702 (1972).

"3. The court below erred by failing to instruct the jury on the offense of voluntary manslaughter."

Here we have an intoxicated person accused of murder who asserts that his voluntary intoxication alone required an instruction of voluntary manslaughter. Counsel's only objection to the instructions was "they fail to include an instruction for voluntary manslaughter due to the alcohol the defendant may have consumed and had in his body at the time of the shooting. We feel that the instruction is justified under the law of this state." The motion for a new trial claimed: "1. The court erred in failing to include an instruction upon voluntary manslaughter because there was substantial testimony that the defendant, at the time of the alleged crime, was heavily under the influence of alcohol, to which counsel for defendant timely objected."

Although counsel claims that Richards was "so drunk he didn't know what he was doing," the evidence does not support this defense. Although witnesses testified that Richards had a drinking problem and was a "heavy drinker" there is little direct evidence of the degree of his intoxication just prior to or at the time of the shooting. The sheriff testified that when Richards

called him at 8:40 p. m. to say that he had just shot Desmond Carter, he talked in a sober and temperate voice. When he later took Richards into custody, after going to the scene of the shooting, he testified: "Now, Rudy at that time was pretty well drunk." He testified that Richards' speech was slurred and his concentration real slow. Of the witnesses who saw Richards on the day of the shooting, Michael Ellegood said that at 5 to 5:30 p. m. Richards was high on something, but he "wasn't really drunk but feeling pretty good." Gobel Burgess said that at about 6:30 p. m., Richards was about as sober as usual. Although he visited with her for some time, his aunt, Mary Richards, was unable to swear that Richards was drunk. Donald Draper testified that although Richards had visited with him from 5:30 to 6 p. m., he didn't know if he was drunk.

David Whitlock, Richards' brother-in-law, was with him from 8:30 a. m. to 11 a. m., during which time Richards consumed three cans of beer. Although he saw him after the shooting, he limited his evidence to the fact that on this occasion Richards was drinking. Richards' father did not see him until after the shooting, and he said that at that time his son was drunk. The mother was with her son for a period of three hours around noon when he came home for dinner. She testified that during this time he drank some beers. She described his condition after the shooting as follows: "I know he had been drinking but I don't know whether he was real dog drunk or not."

There was no area of mutual disrespect or hostility between Carter and Richards. No witness could remember any prior trouble between them. When he was taken into custody, Richards told the sheriff that he and Carter had previously had trouble because Carter had sold some whiskey to his brother (apparently some time before the shooting) and that on the afternoon of the shooting Carter had made some smart-aleck remarks to him about his girl friend.

The circumstance of voluntary intoxication, standing alone, will never require a voluntary manslaughter instruction. This instruction has been "handled right recklessly" in some of our prior opinions. Courts have been inclined to instruct on voluntary manslaughter when intoxication is such as to destroy the accused's ability to form an intent or create malice. When this course is followed, the instruction upon numerous occasions is given without regard to a showing of other required elements of manslaughter and thus reduces the charge to one of a lesser degree without justification. In many instances there should have been a specific instruction as to the legal effect of intoxication as a defense, thereby enabling a jury to acquit an accused rather than find him guilty of a lesser offense.

■ In Shorter v. Commonwealth, 252 Ky. 472, 67 S.W.2d 695 (1934), we said:

"* * * if the act of killing was committed under the influence of passion or in heat of blood, produced by reasonable provocation, that is, such as is ordinarily calculated to excite the passion beyond control, and before a reasonable time has elapsed for the passion to cool and reason to resume its habitual control, out of regard for the frailties of human nature, the crime is mitigated and designated as voluntary manslaughter and a lesser penalty inflicted."

Shorter had been severely beaten at the home of the deceased. He went home and procured a weapon, returned to the home of deceased, and killed him. His defense was that he was so drunk he did not know what he was doing. After discussing the evidence, we said:

"Supplementing the foregoing is the evidence of drunkenness or the effects of the liquor. Such evidence is admitted as of a fact which may have affected the mental condition of the accused and to *show an absence of malice or intent,* thus reducing the offense to manslaugh-

ter, and authorizing an instruction on that degree of murder. * * * But the circumstances of a case may not authorize such an instruction, even though the evidence is properly admitted." (Emphasis ours.)

This part of the opinion would appear to permit a voluntary manslaughter instruction where the drunkenness of the accused shows an absence of malice or intent. However, such is not the case because evidence of drunkenness must be considered along with a showing of (a) sudden affray or (b) sudden heat of passion, upon provocation. If neither of these theories is supported by the evidence, the court should not give a voluntary manslaughter instruction, regardless of intoxication. Absent the required elements of manslaughter, intoxication would at the best require an instruction on the legal effect of drunkenness as a defense.

■ In Perciful v. Commonwealth, 212 Ky. 673, 279 S.W. 1062 (1925), we said:

"In its ordinary acceptation, manslaughter is the unlawful, willful, and felonious killing of another in sudden heat of passion or in sudden affray, and without previous malice, and not in the necessary or apparently necessary self-defense of the slayer. * * * Of course, where there is other and independent evidence tending to show that the killing was done in sudden heat of passion or in sudden affray, and without previous malice, the mere fact that the accused was drunk will not deprive him of a manslaughter instruction; but, when there is no evidence that the crime was committed in sudden heat of passion or in sudden affray and without previous malice, his drunkenness will not have the effect of reducing the crime from murder to manslaughter. * * * ."

See also Slone v. Commonwealth, 238 Ky. 727, 38 S.W.2d 709 (1931); Blackburn v. Commonwealth, 200 Ky. 638, 255 S.W.2d 99 (1923); Abbott v. Commonwealth, 305 Ky. 620, 205 S.W.2d 348 (1947). Regardless of expressions to the contrary appearing in other opinions of this court, we hold that the rule set out in *Perciful* is now the law of the Commonwealth. In the case now before us there was no evidence of sudden heat of passion, sudden affray, or provocation. Therefore, Richards was not entitled to an instruction on voluntary manslaughter regardless of the extent of his drunkenness at the time he shot Carter.

■ Richards' claimed drunkenness was available to him only as a defense to the charge of murder, and only then if there was sufficient evidence to support an instruction on the legal effect of drunkenness. In Tate v. Commonwealth, 258 Ky. 685, 80 S.W.2d 817 (1935), we said:

"* * * Text-writers, as well as courts, are not in harmony as to when such an instruction should be given, or as to the defensive effect of intoxication of the defendant, except they all agree with the statement that it has no defensive effect unless the intoxication is so complete and of such an advanced degree as to totally deprive the defendant of his reason and to render him incapable of knowing right from wrong. In other words, that the intoxication must be, in order to be available, of that degree and extent as renders the defendant practically an automaton with the loss of his rudder of reason, thereby depriving him of the ability to entertain a criminal intent."

See also Hall v. Commonwealth, 258 Ky. 744, 81 S.W.2d 404 (1935), and Henderson v. Commonwealth, Ky., 507 S.W.2d 454 (1974). The evidence of the drunkenness of Richards fails to meet the requirements set out in *Tate*, and the court was not required to so instruct.

■ Finally, counsel argues that as it was the duty of the court to instruct on the whole law of the case Richards was entitled to a voluntary manslaughter instruction for this reason, if for no other.

It is well established, however, that where the evidence points only to the conclusion that the accused is guilty of but one offense, it is not necessary or proper to give instructions embracing lower degrees. Cox v. Commonwealth, Ky., 491 S.W.2d 834 (1973). Cf. Trimble v. Commonwealth, Ky., 447 S.W.2d 348 (1969).

"4. The prosecutor's inflammatory and improper comments during closing argument constituted error which substantially prejudiced appellant."

 Richards' primary objection to the closing remarks of the Commonwealth's attorney concerned his characterization of the psychiatrist and the medical profession generally. If anyone suffered or was embarrassed by these remarks, it was the doctor and not Richards. Comments concerning the testimony of the psychiatrist were within the bounds of propriety, for the attorney was entitled to discuss and draw reasonable inferences from this evidence. Hunt v. Commonwealth, Ky., 466 S.W.2d 957 (1971). Although the attorney's reference to another crime may have been improper, any harm that it may have caused was corrected by the court's admonition. Richards also claims that reference to other infamous criminals was prejudicial. The misdeeds of those mentioned have been ever in the minds of the present generation. It is impossible to conceive that the jury was influenced or shocked by the mention of these men. While a Commonwealth's attorney may not so inflame the jurors with heinous details or consequences of a crime that they, solely out of passion and prejudice, will be led to return a verdict of guilty, he is allowed reasonable latitude in argument to persuade the jurors that the matter should not be dealt with lightly. Harness v. Commonwealth, Ky., 475 S.W.2d 485 (1971). The court is not persuaded that the argument of the Commonwealth's attorney requires a reversal in this case.

The judgment is affirmed.

All concur.